UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS CHAN, | No. C 05-2006 SI (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| A. KANE, warden, | |
| Respondent. | |

## INTRODUCTION

Dennis Chan, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Dennis Chan was convicted in San Francisco County Superior Court of kidnapping for robbery and was found to have used a handgun in the offense. He was sentenced to life imprisonment with the possibility of parole plus one year imprisonment in 1986. His habeas petition does not concern that conviction directly, but instead focuses on a December 19, 2003 decision by a panel of the Board of Prison Terms ("BPT") finding him not suitable for parole.

The BPT identified several factors in support of its determination that Chan was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he was released. The factors identified included the circumstances of the offense, his unstable social history, an escalating pattern of criminal conduct, his need for additional self-help therapy, and his inadequate parole plans. The BPT also relied on opposition to parole from the San Francisco County District Attorney's Office. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Chan sought relief in the California courts. The San Francisco County Superior Court denied his petition for writ of habeas corpus on October 4, 2004 in a reasoned order. Resp. Exh. 3. The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for writ of habeas corpus.

Chan then filed his federal petition for a writ of habeas corpus. The petition alleged that Chan's right to due process was violated because the BPT's denial of parole had insufficient evidentiary support and because the BPT's denial of parole breached his plea agreement. After an unsuccessful motion to dismiss, respondent filed an answer. Chan filed a traverse. The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action occurred at the Correctional Training Facility in Soledad, in Monterey County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

2

1 highest state court available with a fair opportunity to rule on the merits of each and every claim
2 they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that
3 state court remedies were exhausted for the claims asserted in the petition.

**STANDARD OF REVIEW**

6 This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.   Chan's Claim That the Evidence Was Insufficient To support the Decision

   1.   Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for

3

1 disciplinary hearings outlined in <u>Superintendent v. Hill</u>, 472 U.S. 445, 454-55 (1985)). "To
2 determine whether the some evidence standard is met 'does not require examination of the entire
3 record, independent assessment of the credibility of witnesses, or weighing of the evidence.
4 Instead, the relevant question is whether there is any evidence in the record that could support
5 the conclusion reached'" by the parole board. <u>Id.</u> at 1128 (quoting <u>Superintendent v. Hill</u>, 472
6 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so
7 devoid of evidence that the findings of the . . . board were without support or otherwise
8 arbitrary.'" <u>Id.</u> at 1129 (quoting <u>Superintendent v. Hill</u>, 472 U.S. at 457). The some evidence
9 standard of <u>Superintendent v. Hill</u> is clearly established law in the parole context for purposes
10 of § 2254(d). <u>Sass</u>, 461 F.3d at 1129.

11 Furthermore, and of key importance, the parole board is not precluded from relying on
12 unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-
13 offense behavior in determining parole suitability. <u>See id.</u> at 1129 (commitment offenses in
14 combination with prior offenses provided some evidence to support denial of parole). The
15 familiar argument that the BPT cannot rely on these factors is based on the Ninth Circuit's
16 statements in <u>Biggs v. Terhune</u>, 334 F.3d 910 99th Cir. 2003), that suggested that the value of
17 the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's
18 decision is one of 'equity' and requires a careful balancing and assessment of the factors
19 considered. . . . A continued reliance in the future on an unchanging factor, the circumstance
20 of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals
21 espoused by the prison system and could result in a due process violation." <u>Biggs</u>, 334 F.3d at
22 916-17. In <u>Biggs</u>, the Ninth Circuit upheld the initial denial of a parole release date based solely
23 on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that
24 "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of
25 rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and
26 prior conduct would raise serious questions involving his liberty interest in parole." <u>Id.</u> at 916.
27 These statements were dicta and not clearly established federal law as set forth by the Supreme
28 Court, such that the state court's refusal to adopt the <u>Biggs</u> reasoning would be a decision

4

1  contrary to, or an unreasonable application of, clearly established federal law as set forth by the
2  Supreme Court. The Ninth Circuit recently backed away from the Biggs statements, and
3  confirmed that these statements from Biggs were dicta and were inappropriate under § 2254.
4  See Sass, 461 F.3d at 1129. "Under AEDPA it is not our function to speculate about how future
5  parole hearings could proceed." Sass, 461 F.3d at 1129.

6  What little guidance has come from the Supreme Court suggests that judicial review
7  should be extremely deferential to the original decision-maker in the parole context. In addition
8  to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court
9  comments suggest that the judiciary should be quite mindful of the subjective and predictive
10 nature of a parole board's decision. See Greenholtz, 442 U.S. at 13. "No ideal, error-free way
11 to make parole-release decisions has been developed; the whole question has been and will
12 continue to be the subject of experimentation involving analysis of psychological factors
13 combined with fact evaluation guided by the practical experience of actual parole
14 decisionmakers in predicting future behavior. Our system of federalism encourages this state
15 experimentation." Id.; see also id. at 8.

16 Past criminal conduct is not some arbitrary factor like eye color that has nothing to do
17 with present dangerousness. Recidivism concerns are genuine. See Ewing v. California, 538
18 U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent offenders were
19 arrested again within three years of their release). California's parole scheme does not offend
20 due process by allowing the BPT to predict that an inmate presents a present danger based on
21 a crime he committed many years ago.

22 Having determined that there is a due process right, and that some evidence is the
23 evidentiary standard for judicial review, the next step is to look to state law because that sets the
24 criteria to which the some evidence standard applies. One must look to state law to answer the
25 question, "'some evidence' of what?"

5

2.      State Law Standards For Parole For Kidnappers In California

California uses indeterminate life sentences for persons convicted of kidnapping for robbery. See Cal. Penal Code § 209(b). California's parole scheme described below provides that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPT panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2281, allows for consideration of a wide range of information in determining suitability, see § 2281(b), and lists circumstances tending to show suitability and circumstances tending to show unsuitability, § 2281(c) and (d).[1] The regulation also provides that "[t]he panel shall first determine whether a prisoner is suitable

---

[1] The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and serious misconduct while in prison. 15 Cal. Code Regs. § 2281(c). The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2281(d). The circumstances listed as tending to show unsuitability and suitability "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." 15 Cal. Code Regs. § 2281(c) and (d).

6

for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2281(a).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2282. For example, for kidnapping for robbery or ransom, the matrix of base terms ranges from the low of 8, 10, or 12 years to a high of 13, 15, or 17 years, depending on some of the facts of the crime.[2] Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. In re Dannenberg, 34 Cal. 4th 1061, 1070-71 (Cal.), cert. denied, 126 S. Ct. 92 (2005). Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. See id. at 1070-71 (discussing use of matrix in murder cases); 15 Cal. Code Regs. § 2282(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole"). The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime alone can support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for

---

[2] One axis of the matrix concerns the kind of harm done to the victim and the other axis of the matrix concerns the circumstances of the kidnapping. The choices on the axis for the harm to the victim include no/minor harm, victim sexually or otherwise seriously assaulted, victim suffered major injuries, or victim died. The choices on the axis for the circumstances of the kidnapping are minor movement, extensive movement, victim taken hostage, and intricate prior planning for the crime. 15 Cal. Code Regs. § 2282(c).

1  the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th
2  616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's
3  offense, alone, can constitute a sufficient basis for denying parole" but might violate due process
4  "where no circumstances of the offense reasonably could be considered more aggravated or
5  violent than the minimum necessary to sustain a conviction for that offense").

7              3.      Some Evidence Supports The BPT's Decision In Chan's Case
8          The BPT identified several factors supporting its decision to find Chan unsuitable for
9  parole, i.e., the circumstances of the offense, the prisoner's unstable social history and escalating
10 pattern of criminal conduct, the prisoner's in-prison behavior, and the prisoner's inadequate
11 parole plans. The San Francisco County Superior Court upheld the decision in a reasoned order.
12 Resp. Exh. 3. That court stated that some evidence had to support the decision and found that
13 some evidence did support the decision. The state court applied the correct legal standard of
14 some evidence, as evidenced by its citation to In re Rosenkrantz, 29 Cal. 4th at 652, a case
15 which had cited and adopted the Superintendent v. Hill some evidence standard as the proper
16 standard for judicial review of evidentiary sufficiency for parole denial cases. See Rosenkrantz,
17 29 Cal. 4th at 665-67. Because the San Francisco County Superior Court's decision is the last
18 reasoned decision, that is the decision to which 2254(d) applies. See Ylst v. Nunnemaker, 501
19 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert.
20 denied, 126 S. Ct. 2041 (2006).

22                      a.      Commitment Offense
23         The BPT considered the circumstances of the kidnapping for robbery and concluded that
24 it was an carried out in an especially cruel and callous manner.  The BPT determined that the
25 offense was carried out in a dispassionate and calculated manner and was carried out in a manner
26 which demonstrated a disregard for human suffering. December 19, 2003 BPT hearing
27 transcript ("RT"), at 39. The record included the following information about the kidnapping:
28 Chan, Eddie Zheng and David Weng knew each other for 2-3 years before the crime. The

threesome encountered Mr. Tam in his store on January 3, 1986, and followed him home after he closed his shop to learn his home address.  They believed that Mr. Tam had a lot of money because he owned two shops.  The threesome returned to Oakland and discussed robbing Tam's home and store.  They followed Mr. Tam home on January 5 again to get his exact address.  On January 6, 1986, they went to the Tams' home, each armed with a gun.  Zheng and Weng approached Mr. and Mrs. Tam and their children and pointed their loaded guns at them, forcing Mr. Tam to open his door.  Chan followed.  Mr. Tam was pushed into a chair in the living room.  Chan tied up Mrs. Tam in the living room and took her into the second bedroom and taped her mouth.  Zheng tied up Mr. Tam and put him in a separate bedroom.  Chan took bracelets from the two young children and some jewelry which he put in a bag and left by the front door to take with him when they left. Weng put the children in the bathroom.  The threesome took Mr. Tam's wallet, and some jewelry.  One or two of the intruders ripped off Mrs. Tam's clothing and she was threatened with rape.  Zheng found a camera to take pictures of Mrs. Tam tied up and nude.  After they searched the house and had been therefor about four hours, Mrs. Tam was unbound, dressed and taken by Zheng and Chan to the Tams' store while Weng stayed with Mr. Tam and the two children.  Zheng and Chan took money and goods from the store.  As they drove back toward the residence, they were stopped by a police officer for a traffic offense.   During the course of the stop, the officer noticed that Mrs. Tam had tears in her eyes; when asked, she told him that there was danger in her house.  Zheng and Chan were handcuffed and Mrs. Tam told the police that her husband and children were being held hostage.  By the time the police arrived at the residence, Mr. Tam and children had unbound themselves and Weng had fled. Resp. Exh. 11, pp. 3-7.

      At the BPT hearing, Chan disputed some of this information.  He said that he had taken the children to the bathroom and had not tied up Mrs. Tam.  RT 11-12.  Chan admitted that he had threatened her family as he went with Mrs. Tam to the store.  RT 31-32.  In discussing the crime, Chan stated that the threesome believed the Tams had a lot of money because they had a store and the three kidnappers wanted to buy drugs.  RT 9, 14.  The BPT was not required to accept any or all of Chan's version of the crime.

9

The BPT considered a circumstance and factors proper under California law. A circumstance tending to indicate unsuitability for parole is that the prisoner "committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2281(c)(1). The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2281(c)(1).

There was some evidence in the record to support the BPT's determination that the circumstances of the commitment offense indicated unsuitability. The record supported a determination that offense was committed in a dispassionate and calculated way and in a way that demonstrated an exceptionally callous disregard for human suffering. Chan had participated in a home invasion robbery at gunpoint, a couple and their two children were taken hostage; the wife was tied up, stripped, threatened with rape, and then taken to the family's store and told by Chan that her husband and children would be killed if she did not help them get money and property. There was much more than some evidence to support the finding that the circumstances of the offense supported the denial of parole. The BPT identified more than the minimum elements of a kidnapping for robbery when it determined that Chan and his two partners had committed a home invasion robbery and held three family members hostage while forcing Mrs. Tam to go with them to the store to obtain money and property. And Chan had used a gun during the offense. There also was extensive planning which included advance surveillance the Tam home. Although only Mrs. Tam was taken to the store, there really were four victims of the crime. Further, there was a special depravity in the gratuitous stripping of Mrs. Tam and the (real or feigned) picture-taking of her nude and bound. All this showed far more than the minimum elements of a kidnapping for robbery. See Dannenberg, 34 Cal. 4th at 1071.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### b.     Pre-Offense Behavior

The BPT also relied on Chan's escalating criminality and unstable social history. The BPT found that Chan's escalating pattern of criminal behavior supported the decision that he was unsuitable for parole. His escalating criminality was shown by the fact that he had an arrest for petty theft in 1984 and for auto burglary in 1985; neither resulted in a criminal charge, although he admitted he was present while other persons committed each of these offenses. See RT 16.

Consideration of and reliance on Chan's pre-offense criminal history was not improper. Although the prisoner's "previous record of violence" on a victim is a specifically listed circumstance and non-violent criminal history is not specifically listed as a circumstance that tends to indicate unsuitability, 15 Cal. Code Regs. § 2281(c)(2), the list of circumstances in § 2281(c) is non-exclusive, and § 2281(b) specifically allows the BPT to consider a great range of relevant and reliable information, such as the prisoner's "past criminal history, including involvement in other criminal misconduct which is reliably documented." Chan's prior criminal activity could be considered by the BPT as tending to show unsuitability even if it alone might not support a decision that he was unsuitable.

Second, the BPT considered Chan's unstable social history as a factor supporting its decision that he was unsuitable for parole. The record indicated that Chan had problems in school due to language problems after he moved to the United States from China with his family in 1980 when he was 11-12 years old. He had poor grades, truancy problems, fights with other students and was asked to leave school. See RT 17-18. He also had started using cocaine when he was 17. The prisoner's unstable social history was a specifically listed factor that the BPT could rely upon as tending show unsuitability for parole. See 15 Cal. Code Regs. § 2281(c)(3).

### c.     In-Prison Behavior

The BPT found that Chan had not sufficiently participated in the beneficial self-help previously requested by the BPT and he had a CDC-128 counseling memo for delaying the yard recall since his last parole suitability hearing. See RT 40, 42. The San Francisco County Superior Court determined that there was some evidence to support the BPT's finding that Chan

12

needed further self-help work.

Consideration of and reliance on Chan's prison behavior and progress was not improper. Section 2281(b) specifically allows the BPT to consider a great range of relevant and reliable information, such as the prisoner's "past and present attitude toward the crime," social history and mental state.

### d. Parole Plans

The BPT determined that Chan's parole plans were not realistic in that he did not have viable residential or employment plans in the event of his removal to China. See RT 40-41. The BPT decision stated that Chan had good parole plans if he was released to his family in California.

The uncertainty of Chan's parole plans if he was removed from the United States to China appears not to be an adequate reason to find him unsuitable. The BPT properly may consider the uncertain nature of an inmate's parole plans as tending to show unsuitability under § 2402(b), which allows the BPT to consider "any other information which bears on the prisoner's suitability for release." The regulations do not, however, require that a prisoner have alternative plans lined up, i.e., one set for here and another in the event of removal to China. In light of the BPT's determination that Chan had "outstanding support from his family and . . . good parole plans if he were released to California," RT 41, there does not appear to be some evidence to support the finding that the uncertainty of his parole plans tended to indicate unsuitability.

### e. There Was Enough Evidence To Support The Decision

The BPT noted that Chan had various in-prison achievements, but concluded that the positive factors did not outweigh the factors showing unsuitability. The nature of the commitment offense, the increasing criminality, the unstable social history, and the need for further programming factors listed by the BPT in support of its determination that Chan was not suitable for parole had some evidentiary support. And the factors were factors that could be considered in determining parole suitability.

13

The San Francisco County Superior Court identified the commitment offense and Chan's in-prison behavior (i.e., failure to participate in sufficient self-help rehabilitation and the recent receipt of a CDC-128 counseling memo) as circumstances of which there was some evidence and which supported the decision that Chan was unsuitable for parole. The San Francisco County Superior Court's rejection of Chan's due process claim was not contrary to or an unreasonable application of Superintendent v. Hill's some evidence standard. Chan is not entitled to the writ.

B.    Breach Of Plea Agreement Claim

Chan also contends that the BPT's decision to find him unsuitable for parole breached his plea agreement, in violation of his right to due process. See Santobello v. New York, 404 U.S. 257, 261-62 (1971) (defendant has a right to enforce terms of plea agreement).

The San Francisco County Superior Court rejected Chan's claim that the BPT's decision violated the plea agreement. That court found that the conclusory allegations made without any explanation of their factual benefit did not warrant relief. That claim had to be rejected because Chan had not provided a copy of his plea agreement or any other documentation in support of his contention. Resp. Exh. 3, p. 4.

The state court's decision was not contrary to or an unreasonable application of clearly established federal law as set forth by the U.S. Supreme Court, as required for relief under 28 U.S.C. § 2254(d). Chan has not pointed to language in any plea agreement that shows that any particular term in his plea agreement has been breached. His inability to identify any particular term that has been breached undermines his claim. His claim that his plea agreement was breached in violation of his right to due process fails.

/ / /

/ / /

14

**CONCLUSION**

For the foregoing reasons, the petition is denied on the merits. Petitioner's motion for an extension of time to file a traverse is GRANTED. (Docket # 5.) The traverse filed on July 12, 2006 is deemed timely filed. The clerk shall close the file.

IT IS SO ORDERED.

DATED: October 20, 2006

_____
SUSAN ILLSTON
United States District Judge